# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHERYLE CARLSON,

        Plaintiff,

    v.                                  Case No. 09-C-551

CARROLL UNIVERSITY f/k/a
CARROLL COLLEGE,

        Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S
## SUMMARY JUDGMENT MOTION

On June 1, 2009, the plaintiff, Cheryle Carlson ("Carlson") filed an action in the Eastern District of Wisconsin pursuant to Section 504 of the Rehabilitation Act of 1973. Specifically, Carlson alleges that the defendant, Carroll University ("Carroll"), failed to reasonably accommodate her disability, which would have allowed her to complete the requirements of the Entry-Level Physical Therapy Program (the "PT Program"), and that it failed to "reasonably eliminate adverse discrimination against [her] by her classmates due to her disabilities and the accommodations Carroll provided her . . . ." (Compl. ¶¶ 32-33.)

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b). And finally, both parties have consented to the exercise of jurisdiction by a magistrate judge. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73(b)(1).

Currently pending before the court is Carroll's motion for summary judgment as well as its motion in limine to exclude the expert testimony and report of Nira Scherz-Busch, M.S. and Asja Young, M.D. The motions have been fully briefed and are ready for resolution. For the reasons that

follow, Carroll's motion for summary judgment will be granted, and its motion in limine to exclude the expert testimony and report will be granted in part and denied in part as moot.

## I. FACTUAL BACKGROUND

In August 2004, Carlson, who was almost fifty years of age at the time, applied for admission to Carroll's PT Program. (DPFOF ¶ 12.) By letter dated August 25, 2004, Carroll awarded Carlson probationary acceptance to its PT Program for the fall of 2004. (DPFOF ¶ 17.) Such admission was probationary because the applicable admission criteria for the PT Program required a cumulative college grade point average ("GPA") of 3.0 or higher on a 4.0 scale, and Carlson did not meet the criteria. (DPFOF ¶ 16.) Under the terms of her probationary acceptance, Carlson was required to maintain a 3.0 GPA in every semester to avoid academic dismissal from the PT Program, and to meet with her academic advisor, Sara Deprey ("Deprey"), to complete a learning contract. (DPFOF ¶¶ 18-19.)

In her first semester of the PT Program, Carlson began emailing her instructor, Mark Erickson ("Erickson"), about her inability to find peers to practice and study with. In October 2004, Carlson e-mailed Erickson and asked him whether she could have "another try at [the mid-term] due to the fact that [she] ha[d] no partner and [felt] unbelievably uncomfortable." (DPFOF ¶ 87.) Erickson responded by stressing the importance of finding someone in her class to practice with. He indicated that he was "not aware of any specific dynamic within [Carlson's] class that would inhibit this . . . ." (DPFOF ¶ 88.) Additionally, Erickson suggested that Carlson approach her mentor and also that she meet with him (Erickson) either during office hours or outside of office hours by setting up an appointment. (DPFOF ¶ 88.) Carlson emailed Erickson again, in December of 2004, regarding a practical examination for which she could not find a practice partner. (DPFOF ¶ 89.) Erickson responded by reminding her of other "learning strategies" that they had discussed in the past,

2

including "big brother/big sister, Chris Malcowitz, PT, myself, etc." (DPFOF ¶ 90.) Despite these obstacles, Carlson obtained a B in Erickson's class. (DPFOF ¶ 91.)

Beginning in the fall of 2004, Carlson began meeting with Andrea Broman ("Broman"), the Disability Services Coordinator at the Walter Young Center ("WYC"), for academic coaching. At this time, Carlson completed a Study Skills Assessment form wherein she indicated, on a scale of "0" to "5," with "5" being "very much so," that she had trouble at a level of "5" with "[t]aking tests," "[t]ime management," and "[o]rganization. (PPFOF ¶ 31.) Carlson also indicated that she had trouble at a level of "3" with "[r]eading comprehension." (PPFOF ¶ 31.)

Despite these complaints, in the fall 2004 semester, Carlson completed the required learning contract and successfully completed the terms of her probation by earning a 3.125 GPA. (DPFOF ¶ 19.) Thus, Carroll removed Carlson from academic probation by letter dated January 10, 2005. (DPFOF ¶ 20.)

In February 2005, Carlson was diagnosed with Attention Deficit Disorder ("ADD"). Carroll students with disabilities were directed to the WYC, which assessed and approved accommodations for Carroll students with disabilities. (DPFOF ¶ 22.) Therefore, in February 2005, Carlson presented to Broman a hand-written note signed by both a nurse practitioner and her family doctor setting forth a diagnosis of ADD. (DPFOF ¶ 23.) This note stated as follows: "Cheryle Carlson has sought care during the recent major life changing circumstances bringing her career change which required further education. Past history revealed challenges with focus issues directing options to attention disorder treatments. This has been proven to be very helpful and will be continued." (DPFOF ¶ 23.)

On February 11, 2005, Carlson completed and signed a Student Disability Intake Form and a Reasonable Accommodation Conference Form, which identified ADD, as her disability. (DPFOF ¶¶ 25-27.) By signing the Reasonable Accommodation Conference Form, Carlson acknowledged that

3

she was present at the reasonable accommodation conference at which she was informed that she would be provided with "[t]ime + ½ on test (as needed)" as an accommodation. (DPFOF ¶ 28.) On that same day, February 11, 2005, Broman notified Carlson's instructors that she had submitted proper documentation of a disability, and Broman also identified "time and ½ for exams and quizzes (as needed)" as the approved accommodation. (DPFOF ¶ 29.)

On Feburary 15, 2005, Carlson sent Kristine Knutson ("Knutson"), an Adjunct Instructor at Carroll, an e-mail asking whether she could hire Knutson to tutor her. (DPFOF ¶ 66.) Knutson supervises students in the PT Program during a two-hour evening practice session and administers practical examinations and skill checks in the Musculoskeletal Disorders I and II classes taught by Erickson. (DPFOF ¶ 67.) Therefore, Knutson did not accept Carlson's offer to act as a paid tutor because she did not have time and because she understood that such paid tutoring arrangement would be a conflict of interest, given that she would be grading practicals that semester in the Musculoskeletal Disorders I class in which Carlson was enrolled. (DPFOF ¶ 68.) According to Carlson, Knutson never responded to her to tell her this. (Pl.'s Resp. to DPFOF ¶ 68.)

Carlson also asked Erickson to provide her with a tutor, who would be paid, but Erickson refused. (DPFOF ¶ 70.) Erickson considered the use of an instructor as a tutor "inappropriate." (DPFOF ¶ 70.) Rather, Erickson specifically suggested that Carlson practice with classmates, her mentor, or any other person outside of class. (DPFOF ¶ 80.) Carlson claims that she also asked Broman for a tutor to assist her, but Broman refused. (PPFOF ¶ 49.) Carlson never made a formal written request to Broman, and Broman never asked her to do so. (PPFOF ¶ 50.) Finally, it is undisputed that Carroll does not offer tutoring on the PT Program curriculum. (DPFOF ¶ 71.)

On March 11, 2005, Carlson signed and submitted a Request to Change Accommodations for her ADD, seeking to add an additional testing accommodation of "separate room ([Walter Young

4

Center]) arranged by the student." (DPFOF ¶ 31.) On that same day, Carroll approved this additional accommodation, and Broman subsequently advised Carlson's instructors of this additional approved accommodation for a "[s]eparate room for testing (at [Walter Young Center]), arranged by student." (DPFOF ¶ 34.) The notice from Broman to the faculty also stated as follows: "I would recommend that you speak privately with the student to discuss his/her disability and classroom needs." (PPFOF ¶ 39.)

On April 1, 2005, Carlson emailed an instructor asking to postpone an exam. (DPFOF ¶ 92.) In her request, Carlson stated that she "just will not pass this test" and that "it's difficult studying this stuff without a study partner, at least for me anyway." (DPFOF ¶ 92.) The faculty member did not reschedule the exam, and Carlson went on to obtain a B in the course. (DPFOF ¶ 93.)

In the fall of 2006, sixteen students were enrolled in the PT Program. (DPFOF ¶ 76.) At that time, Carlson was enrolled in the Musculoskeletal System Disorders II ("Ortho") class, which involved practical examinations during which the student performs an evaluation of a "patient" role-played by another student to demonstrate the hands-on-clinical skills taught in the course. (DPFOF ¶¶ 73-74.) Students could practice these skills during class time with partners under the supervision of Erickson, and Carroll also provided a two-hour evening practice session on two evenings per week, under the supervision of a licensed physical therapist employed by Carroll. (DPFOF ¶¶ 75, 77.) Carroll required students to attend two hours of practice time per week, but students were free to attend all four hours per week. (DPFOF ¶ 78.)

Each and every semester at Carroll, Carlson complained that her classmates would not practice with her. (DPFOF ¶ 82.) According to Carlson, none of her classmates signed up to work with her, and they never responded to her requests for guidance. (DPFOF ¶ 84.) When Carlson brought her concerns to Broman about her difficulties such as deciphering test questions and assignments,

5

securing practice partners, and engaging a tutor, Broman told Carlson to talk to her instructors or else referred her to other resources. (PPFOF ¶ 42.)

Carlson never told any of her peers that she was diagnosed with ADD. (DPFOF ¶ 83.) The parties dispute whether Carlson's peers ever expressed resentment towards her accommodations of additional time for testing in a private testing location. (DPFOF ¶ 126; Pl.'s Resp. to DPFOF ¶ 126.) However, it is undisputed that Carlson never made a complaint of discrimination or harassment by her peers to the Dean of Students. (DPFOF ¶ 38.)

On a few occasions, Carroll faculty got involved in the situation with Carlson and her peers. In Feburary 2006, Deprey spoke to Carlson about reports she had received that Carlson's classmates felt that she monopolized faculty time, and Deprey discussed with her how she could seek to change negative perceptions that her classmates had about her. (DPFOF ¶ 94.) Deprey also asked a group of Carlson's classmates to "extend the olive [branch] to Cheryle," to which they indicated they "tried this, and she just walks away, or she'll be sarcastic and walk away." (DPFOF ¶ 95.) In the fall of 2006, Carlson received a grade of "72" from her peers after she did not complete her assigned tasks for a group project. (DPFOF ¶¶ 111, 113-14.) In response, her instructor, Edward Maher ("Maher"), mediated a discussion with Carlson's group, and her group decided that adjusting her grade upward to a score in the "B" range was appropriate. (DPFOF ¶ 116.) Subsequently, Maher adjusted her grade accordingly. (DPFOF ¶ 116.) Additionally, in December 2006, Deprey allowed Carlson to reschedule a presentation that she was supposed to make to her Neurological Systems Disorders II class because, shortly before the presentation, Carlson was confronted by a peer, Kim Dama ("Dama"). Dama accused Carlson of being "mean" to another classmate, Carrie Scharl ("Scharl"), and calling Scharl, who was a member of Carlson's prayer group, "unchristian." (DPFOF ¶¶ 120-12, 123.) Dama asked Carlson why she would treat Scharl poorly when Scharl had been nice to her. (DPFOF ¶ 122.)

Deprey allowed Carlson to give her presentation on a different day, one-on-one, instead of before the class.  (DPFOF ¶ 124.)

Following Carlson's confrontation with Dama, Erickson received an e-mail from the 2007 class president of the PT Program, which stated as follows:

> We are concerned about the faculties [sic] tendency to avoid conflict with the class situation.  We have honestly exhausted every possible option for talking with Cheryl, helping her, avoiding her, etc. . . . .  The reason we finally came to you as a faculty is because we don't know what else to do. . . . .
>
> . . . .  Also, the class would be more likely to apologize if Cheryle were also willing to apologize for the very unprofessional, extremely rude, and downright mean manor [sic] she has routinely addressed us over the last three years.
>
> At the very least, we would appreciate it if the faculty would sit down with Cheryle and perhaps address the fact that her behavior is unacceptable. . . . .
>
> One suggestion we have is that perhaps the faculty should mediate and referee a class discussion. . . . .  We have numerous time attempted to tell her in a respectful way, that she would have better responses from the class if she quite [sic] blaming others, yelling at others, and being so harsh when confronting classmates.
>
> . . . .  At the very least, we would appreciate it being recognized that her behavior is inappropriate and apologies then made by ALL!!!

(DPFOF ¶ 125.)  Although the PT Program faculty considered facilitating a class meeting to discuss the tension between Carlson and her classmates in late December 2006, this meeting never happened.  (DPFOF ¶ 127.)

In September 2006, after observing Carlson exit the Ortho class for a brief period of time without notice during a skill practice session, Erickson again suggested to Carlson that she ask athletic training students, classmates, and regional therapists to practice with her.  (DPFOF ¶¶ 98-99.)  Carlson did not ask any athletic training students to practice with her, but she did shadow a licensed physical therapist outside of work for two hours a week, and he role-played patient with her for practice.  (DPFOF ¶¶ 100-01.)  Then, on December 9, 2006, Carlson sent Erickson an e-mail asking if they

could meet to go through an exam, stating: "I would like to walk through an exam as you would like to see it done. Hand held." (DPFOF ¶ 103.) At the conclusion of her Ortho class, Carlson emailed Erickson, stating as follows: "I feel very fortunate for the time we spent going over a myriad of things, I feel it helped." (DPFOF ¶ 104.)

Being that Carlson was admitted on probationary status, if she were to be placed on academic probation a second time, she would be dismissed from the PT Program. (DPFOF ¶ 40.) One way in which Carlson could be placed on academic probation a second time was if she failed to obtain a GPA of 3.0 or better in each semester, regardless of her overall GPA. (DPFOF ¶¶ 40-41.) And, this is precisely what happened. Carlson satisfied the 3.0 GPA requirement for the following semesters: fall 2004, spring 2005, summer 2005, fall 2005, spring 2006, and summer 2006. (DPFOF ¶ 39.) However, in the fall semester 2006, Carlson earned a "C" in Ortho, thereby causing her GPA for that semester to fall below the mandated 3.0 GPA, specifically, to a 2.727. (DPFOF ¶¶ 39, 43.)[1] As a result, Carroll placed Carlson on academic probation. Because this was her second time on probation, Carroll, by letter dated January 8, 2007, dismissed Carlson from the PT Program. (DPFOF ¶ 46.)

Pursuant to Carroll's Graduate Catalog, on or about January 17, 2007, Carlson appealed her dismissal from the PT Program to the Graduate Professional Studies Academic Steering Committee ("ASC"). (DPFOF ¶¶ 48-49.) In support of her appeal, Carlson gave the following statement:

> During this past semester I was challenged both scholastically and personally. I was renting a room and private bathroom in a house where the owner turned off the hot water, and would not fix the toilet to where I could actually use it, and then in October decided he was not going to turn the heat on. So I lived in an environment where I could not take a shower in a house with no heat or usable plumbing. While I struggled with the property owner to provide basic living necessities I was personally afraid for my safety. This took a personal toll on me and had a direct negative impact on my studies. In November, I realized I would not be able to stay in a place that was neither

---

[1] The Ortho class did not involve a peer grading component, and there was no peer grading of practical examinations. (DPFOF ¶ 110.)

safe nor conducive for the intense studying needed for the physical therapy program here at Carroll College. I left the majority of my belonging [sic] in the place I was renting and found a place that was now safe and conducive to studying. The property owner, then changed the locks and I was not able to get at all my study materials for school. The problem was I waited too long to make the change and I do not foresee this situation ever repeating itself. By this time, most of the semester was over and I was not able to bring up my grade in my musculoskeletal class, to an acceptable grade. I was trying to make the most of a very difficult situation.

(DPFOF ¶ 51.) Because Carlson did not reference her disability in her appeal, the ASC did not consider any matters related to her disability. (DPFOF ¶ 52.) Finding that "all policies of the Physical Therapy Academic Action policy have been followed," the ASC, by letter dated January 18, 2007, denied Carlson's appeal. (DPFOF ¶ 53.)

After receiving the ASC's decision, Carlson wrote a letter dated January 21, 2007 to the Registrar stating, in part, as follows:

I am greatly disappointed at the Steering Committee's unwarranted decision for my dismissal and I want you to know that this decision is totally unacceptable. I am requesting more information as to how the process was determined for my dismissal from the PT program especially in light of my excellent academic standing and the solidness of all my grades.

(DPFOF ¶ 55.) On January 21, 2007, Carlson also emailed Provost Lynne Bernier ("Bernier"), asking to speak to Bernier regarding her dismissal and stating that she felt Carroll was treating her unfairly and singling her out due to her learning disability. (PPFOF ¶ 93.) Bernier responded by confirming that Carlson's dismissal was according to policy and that her requested accommodations had been granted. (PPFOF ¶ 94.) Then, on March 28, 2007, Carlson submitted an appeal of a court judgment against her in an eviction action brought by the landlord referenced in her appeal to the ASC, in which she stated as follows:

I have since been kicked out of Graduate school and I am currently fighting for my future. I got a grade of "C" and that grade was due to the fact that I had no heat, I had to defecate in the yard and no hot water.

. . . .

. . . . Since I currently have no future and owe $75,000 for my schooling that I will not receive a diploma for due to the upset [the landlord] caused me during the Fall of '06 I need to make payments.

(DPFOF ¶ 57.)

According to Carroll, other than a tutor and the accommodations approved by the WYC, Carlson never made a request for any other specific accommodation. (DPFOF ¶ 64.) However, Carlson maintains that she also requested that Carroll "assign or provide a practice partner for practicing hands on skills, that she be allowed 'do-overs' regarding test questions that she misinterpreted due to her ADD and that she receive appropriate help in developing time-management, organizational, communications and study skills." (Pl.'s Resp. to DPFOF ¶ 64.)

It was not until Feburary 2010, during the course of this litigation, that Carlson was diagnosed with disorders in addition to her original diagnosis of ADD. Specifically, in February 2010, Carlson was diagnosed as suffering from "language-based Developmental Learning Disorders, ADHD and a subsequent Depressive Disorder throughout her life." (PPFOF ¶ 4.)

## II.  STANDARD OF REVIEW

A district court shall grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986). A party asserting that a fact cannot be or is genuinely disputed must support

the assertion by

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). However, a mere scintilla of evidence in support of the nonmovant's

position is insufficient. *See Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133,

1137 (7th Cir. 2009).

To determine whether a genuine issue of material fact exists, the court must review the record,

construing all facts in the light most favorable to the nonmoving party and drawing all reasonable

inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing

*Anderson*, 477 U.S. at 255). "'[I]n the light most favorable' . . . 'simply means that summary

judgment is not appropriate if the court must make a choice of inferences.'" *Harley-Davidson Motor*

*Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (quoting *Smith v. Severn*, 129 F.3d

419, 426 (7th Cir. 1997)).

### III. DISCUSSION

Carlson brings this action under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

This statute was designed to protect disabled persons from discrimination in the provision of public

services. *Werth v. Bd. of Dirs.*, 472 F. Supp. 2d 1113, 1126 (E.D. Wis. 2007) (citing *K.M. ex rel. D.G.*

*v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 357 (S.D.N.Y. 2005)). Section 504 of the

Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely

by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or

11

be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." § 794(a).[2]

Specifically, Carlson claims that Carroll "unlawfully failed to provide her with reasonable accommodations to her disabilities," and that Carroll "unlawfully discriminated against her when it failed to take reasonable care to eliminate and prevent adverse discrimination and harassment of Carlson by her classmates due to her disabilities and the accommodations Carroll provided her." (Pl.'s Br. 1-2.)

Carroll has moved for summary judgment with respect to both of Carlson's claims. According to Carroll, Carlson's failure to accommodate claim suffers from five "fundamental flaws": (1) "Carlson impermissibly bases her failure to accommodate claim on disabilities she never disclosed and accommodations she never requested"; (2) "Carroll provided reasonable accommodations requested by Carlson for the only disability of which it was aware (ADD)"; (3) "the accommodations Carlson claims to have needed to obtain better than a 'C' in Ortho are not 'reasonable accommodations' as a matter of law"; (4) Carlson failed to "follow Carroll's established procedure for requesting an accommodation," which "bars her failure to accommodate claim"; and (5) Carlson cannot demonstrate that any of her purported reasonable accommodations would have enabled her to earn a grade higher than a "C" in Ortho. (Def.'s Br. 5.) With respect to Carlson's peer discrimination claim, Carroll argues that there is no competent evidence of disability-based harassment, and "even if her classmates['] avoidance of her and general dislike could be construed as 'harassment,' the record cannot support a finding that Carroll had actual knowledge of the harassment and responded with deliberate indifference." (Def.'s Br. 2-3.) Furthermore, Carroll claims that Carlson is not a qualified individual with a disability under the Rehabilitation Act. (Def.'s Br. 25-26.)

---

[2] Carroll does not dispute that it receives federal funding.

Case 2:09-cv-00551-WEC   Filed 11/28/11   Page 12 of 31   Document 70

## A. Failure to Accommodate Claim

In the higher education context, a plaintiff alleging failure to accommodate under § 504 of the Rehabilitation Act must establish that (1) she is a qualified individual with a disability; (2) the defendant was aware of her disability; and (3) the defendant failed to reasonably accommodate her disability. *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th and 22nd Judicial Circuits*, 601 F.3d 674, 678, 678 n.2 (7th Cir. 2010) (analyzing a failure to accommodate claim under the ADA, but recognizing that the "standards are the same under the ADA and Rehabilitation Act"); *see also Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

Under the Rehabilitation Act, an "individual with a disability" means any person who (1) has a physical or mental impairment that substantially limits one or more major life activities of such individuals, (2) has a record of such impairment, or (3) is regarded as having such an impairment. 29 U.S.C. § 705(20), 42 U.S.C. § 12102(1); *see also Knapp v. Northwestern Univ.*, 101 F.3d 473, 478 (7th Cir. 1996).

Carlson asserts that she has "been diagnosed with learning disabilities and Attention Deficit Disorder (ADD), that she had a record of having those diagnoses and that Carroll regarded her as having those disabilities." (Pl.'s Br. 7.)[3] According to Carlson, her condition substantially limited her ability to engage in the major life activity of learning, reading, and communicating. (Pl.'s Br. 20.)

In determining whether an employee was disabled within the meaning of the ADA, the Seventh Circuit stated in *EEOC v. AutoZone, Inc.*, 630 F.3d 635, 639-40 (7th Cir. 2010), that their "role [was] not to decide whether [the employee] was actually disabled under the ADA. Rather, [it]

---

[3] At the time Carlson was enrolled in the PT Program, it is undisputed that the only disability she informed Carroll of was ADD. Carlson was not diagnosed with learning disorders until well after her dismissal from the PT Program. Thus, Carroll disputes that it regarded her as having any learning disabilities.

need decide only whether a rational jury, viewing any conflicting evidence in the light most favorable to the [plaintiff], could so decide." Following the Seventh Circuit's lead, I will assume, granting Carlson the benefit of the inferences to which she is entitled at this stage of litigation, that she has satisfied her burden of putting forth evidence from which a reasonable jury could find that she was an individual with a disability under the Rehabilitation Act. However, the question then becomes whether Carlson was "otherwise qualified" to continue in the program. "A . . . disabled person is 'otherwise qualified' to participate in a program if she can meet its necessary requirements with reasonable accommodation." *Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 435 (6th Cir. 1998); *see also Klene v. Trs. Ind. Univ.*, 2010 U.S. Dist. LEXIS 74740, at *23 (S.D. Ind. July 23, 2010) (finding plaintiff was not a "qualified individual with a disability" because she could not complete the minimum requirements of the program despite the reasonable accommodations provided to her). Thus, it is first necessary to determine whether Carroll provided reasonable accommodations to Carlson.

Carlson must establish that Carroll knew about her particular disability to make a viable claim that Carroll failed to reasonably accommodate her disability. *See Gratzl*, 601 F.3d at 682 (employer is required to "mak[e] reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual"); *Salvador v. Bell*, 622 F. Supp. 438, 439 (N.D. Ill. 1985), *judgment aff'd*, 800 F.2d 97 (7th Cir. 1986) (holding that the obligation to reasonably accommodate a disabled student "only arises when the recipient knows of or is made aware of a beneficiary's handicapping condition"); *see also Kaltenberger*, 162 F.3d at 437 (finding that the "College was not obligated to provide accommodation until plaintiff had provided a proper diagnosis of ADHD and requested specific accommodation").

Case 2:09-cv-00551-WEC   Filed 11/28/11   Page 14 of 31   Document 70

For purposes of Carroll's summary judgment motion, Carlson does not dispute that the only disability Carlson informed Carroll of at the time she was enrolled in the PT Program was ADD. (Pl.'s Br. 21.) However, it is at this juncture that Carlson merges what Carroll knew at the time she was enrolled in the PT Program with what she believes Carroll should have known with respect to her disability. Carlson argues that Carroll should have accommodated her based upon her self-reported struggles in the PT Program. Carlson's premise though—that Carroll should have accommodated impairments that may very well have been caused by a disability not even known by Carlson herself—is untenable. As the Seventh Circuit has stated, "it may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability. Nor should deliberate ignorance insulate an employer from liability." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995). But, Carlson's newly diagnosed learning disorders went undetected for more than fifty years. Not her teachers or peers in grade school or high school, not her professors or classmates in college, not her colleagues of the profession in which she worked before going back to graduate school, and not even Carlson herself knew that she suffered from any learning disorder during the relevant time period. Certainly Carroll could not reasonably have known, even from Carlson's complaints about the difficulties she was having in the PT Program, that she suffered from any learning disorder.[4]

Further, Carroll's policy is that a student must provide "recent, relevant and comprehensive medical documentation of a disability, and the disability's impact on the student's participation in a

_____

[4] A Study Skills Assessment form that Carlson completed asked, "Do you think you have learning issues?" (PPFOF ¶ 30.) To this, Carlson responded as follows: "interpreting what I've learned" and "I look @ things differently." (PPFOF ¶ 30.) This does not translate into knowledge by Carroll that Carlson had any learning disorders. Ironically, Carlson did not know that she had any learning disorders at this time. Carlson did not provide any documentation indicating that she had any learning disorder, much less any learning disorder that needed to be accommodated. Carroll did not have an obligation to ferret out this information.

course, program, or activity." (DPFOF ¶ 9.) Carroll's policy is not only acceptable, but commonplace. *See* LAURA ROTHSTEIN AND JULIA ROTHSTEIN, Disabilities and the Law 253 (4 ed. 2009) ("Where a student or applicant claims a disability, it is legal and appropriate to require documentation."). Although Carlson has since been diagnosed with developmental learning disorders, the undisputed facts reveal that the only disability that Carlson disclosed to Carroll was ADD. Carlson never provided documentation of any learning disorder to Carroll. Simply stated, Carroll was not required to accommodate a disability of which it was unaware. Thus, the only disability that Carroll was obligated to accommodate was Carlson's ADD, and the relevant inquiry is whether Carroll reasonably accommodated Carlson's known disability: ADD.

In support of her claim that Carroll failed to provide reasonable accommodations, Carlson provides a collaborative expert report from Nira Scherz-Busch, M.S. ("Scherz-Busch") and Abigail (Asja) M. Young, MD. ("Young").[5] In this report, Scherz-Busch diagnoses Carlson with ADHD, language-based developmental learning disorders, and depressive disorder. Scherz-Busch opined that Carlson "suffered from undiagnosed language-based Developmental Learning Disorders, ADHD and a subsequent Depressive Disorder throughout her life." (Doc. No. 42, Ex. 2 at 15.) In accordance with this diagnosis, Scherz-Busch's clinical impressions reflected the impact of all of these diagnoses. Scherz-Busch goes on to state her professional opinion that (1) Carroll failed to offer other reasonable accommodations or provide "professional help in developing appropriate time-management, organizational, communications and study skills along with Assitive Technology which would have lessened the impact of her disorders upon her studies at the school"; (2) "it was the responsibility of

---

[5] Although Young oversaw the report, Scherz-Busch authored the report. Thus, the court will refer to the report as reflecting the analysis and opinions of Scherz-Busch. (*See* Young Dep. 45; Young stating that she only reviewed the recommendations because "that's more of Nira's field of specialty than mine.")

those working with [Carlson] at Carroll University to direct her to refer herself for a further assessment of the nature of her difficulties"; and (3) "Cheryle's struggles to show her true ability on 'hands on' tasks which required 'cooperative learning' . . . in the 'Ortho' class was a direct result of the lack of understanding and empathy for her disabilities on the part of faculty and students." (*Id.* at 15-16.) Finally, Scherz-Busch based her recommendations regarding the accommodations Carlson needed not solely on Carlson's ADD, but on her cumulative state, including the new diagnoses that Carroll never knew about. (*Id.* at 16-17.)

Because Scherz-Busch fails in her report to differentiate between Carlson's known ADD and her additional, later discovered impairments, that report will be stricken. The relevant inquiry, as previously stated, is whether Carroll accommodated Carlson's ADD because that is the only disability that Carlson disclosed, and provided documentation of, to Carroll. Carlson's expert has opined what her limitations were/are and what accommodations she will require to successfully complete the PT Program. What Carlson's expert fails to do, however, is to separate the limitations caused only by ADD from the newly diagnosed learning disorders. By failing to distinguish between Carlson's ADD and her newly diagnosed disorders, Scherz-Busch's report is confusing, and it is not helpful in assisting either the court or a reasonable jury in determining whether Carroll reasonably accommodated Carlson's ADD. *See* Fed. R. Evid. 402, 403. Accordingly, Carroll's motion to strike the collaborative report of Scherz-Busch and Young will be granted.[6]

---

[6] To the extent that Scherz-Busch's and Young's testimony reflects the same analysis and opinions as that contained in the report, their testimony will be stricken. The testimony that survives Carroll's motion to strike (assuming it also survives Carroll's *Daubert* challenge) does not create a disputed issue of material fact. For the reasons set forth in the substance of this decision, Carroll did not fail to reasonably accommodate Carlson's ADD. Therefore, the motion to strike Scherz-Busch's and Young's testimony will be denied in part as moot.

17

Carlson asserts that Carroll failed to reasonably accommodate her disability in a number of different ways. Carlson claims that she requested and did not receive the following accommodations: (1) a tutor; (2) an assigned practice partner for practicing hands on skills; (3) that she be allowed do-overs; (4) that she be allowed to reschedule exams and quizzes; and (5) that she be provided assistance in developing time management, organizational, communication, and study skills; and (6) that Carroll take reasonable measures to address her classmates' resentment of her. (Pl.'s Resp. to DPFOF ¶ 63.) Carroll contends that the only specific accommodation that Carlson requested and that was not provided to her was a tutor. (DPFOF ¶ 64.)

Carroll argues that, because Carlson never requested the specific accommodations through the WYC that she now identifies (excluding the tutor), she is precluded from pursuing a § 504 claim based upon the failure to provide such accommodations. Unlike in elementary and secondary education, at the postsecondary level, "it is the student's responsibility to make his or her handicapping condition known and to request academic adjustments." U.S. Dept. of Education Office for Civil Rights, The Civil Rights of Students with Hidden Disabilities Under Section 504 of the Rehabilitation Act of 1973 (1995), http://www2.ed.gov/print/about/offices/list/ocr/docs/hq5269.html; *see also Axelrod v. Phillips Academy*, 46 F. Supp. 2d 72, 83 (D. Mass. 1999) ("The burden is not on the school to establish that there was nothing else it could have done to help [the student] to graduate, rather, the burden is on the plaintiffs to show that they requested a reasonable accommodation and the school denied it.").

Along the same lines, Carroll's established procedure required students to document a disability and to participate in a Reasonable Accommodation Conference, after which the WYC would assess and approve accommodations. Carlson knew about this process and utilized it to her advantage in providing documentation of her ADD and requesting to be accommodated by being given extra

18

time to take tests and quizzes in a separate room. Notably, however, the documentation that Carlson provided revealed nothing about how ADD functionally limited her; nor did it suggest what modifications she would need or how such accommodations were related to her ADD. Carlson never submitted through Carroll's established procedure any of the additional accommodations that she now claims she needed. Nevertheless, I will assume (for purposes of this motion) that the manner in which she requested such accommodations (so long as the record evidence demonstrates that she requested in some fashion these accommodations) was sufficient to trigger Carroll's obligation to provide all reasonable accommodations.[7]

Carlson bears the burden of demonstrating that she requested reasonable accommodations and that those accommodations would render her otherwise qualified to complete the requirements of the PT Program. *See Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1077 (8th Cir. 2006). Postsecondary educational institutions "shall make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student." 34 C.F.R. § 104.44(a).

Postsecondary educational institutions may be required to provide disabled students with auxiliary aids, such that a "handicapped student" is not "denied the benefits of, excluded from participation in, or otherwise subjected to discrimination because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills." 34 C.F.R. § 104.44(d)(1). However, services of a "personal nature" are not deemed "reasonable." Specifically, the pertinent regulation states as follows:

> Auxiliary aids may include taped texts, interpreters or other effective methods of
> making orally delivered materials available to students with hearing impairments,

---

[7] Carlson cites no record evidence demonstrating that she ever requested "extra time and a distraction-free environment." (PPFOF ¶ 76.)

19

readers in libraries for students with visual impairments, classroom equipment adapted for use by students with manual impairments, and other similar services and actions. Recipients need not provide attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature."

34 C.F.R. § 104.44(d)(2). Additionally, to be a reasonable accommodation, any modifications requested must be related to the disability. *Stern v. Univ. of Osteopathic Med. & Health Sciences*, 220 F.3d 906, 908 (8th Cir. 2000).

I will begin first by discussing Carlson's undisputed request for a tutor. Carlson requested a tutor to assist her with her practical skills. Carlson contends that providing her with a tutor was necessary because the "accommodations she received for her disabilities fostered a negative perception of Carlson on the part of her classmates that negatively impacted their willingness to partner with her to practice the practical skills in the Ortho class." (Pl.'s Br. 30.) However, this reason insufficiently links the requested modification to her disability because, as will be discussed below, there is no evidence demonstrating that her peers' unwillingness to work with her was attributable to any resentment they harbored towards her or any negative perceptions they had of her because of the accommodations she received. No doubt, Carlson experienced difficulties in interacting with her peers, and she had difficulty finding peers to practice with. However, Carlson has not demonstrated that her inability to secure practice partners was because her ADD caused her to engage in the behavior that made her classmates unwilling to work with her. Merely citing to an article that details the social problems that people with attention deficit/hyperactivity disorder ("ADHD") may experience, (*see Porter Decl.* ¶ 2), falls short of demonstrating that *Carlson's* social problems were the result of *her* ADD. No such evidence in this case exists.

Additionally, the note that Carlson provided to Carroll in documenting her disability did not identify that Carlson's ADD limited her ability to interact with others. Specifically, the note stated that "Cheryle Carlson has sought care during the recent major life changing circumstances bringing

20

her to a career change which required further education. Past history revealed challenges with focus issues directing options to attention disorder treatments. This has been proven to be very helpful and will be continued." (DPFOF ¶ 23.) Not only does her documentation reflect that she only struggled with focus issues, but it also indicates that treatment was helpful in ameliorating her focus problems. Nevertheless, although Carroll denied the specific tutor that Carlson requested because of the conflict of interest presented by such request, Erickson suggested that Carlson practice with her mentor, any other person outside of class, athletic training students, physical therapists, and big brother/sister. Erickson also made himself available to help Carlson. Indeed, Erickson spent extra time with Carlson "going over a myriad of things," which Carlson admitted as being helpful. Carroll also offered four hours of practice time every week, which was supervised by a licensed physical therapist employed by the University. Further, Carlson shadowed a licensed physical therapist outside of work for two-hours a week, and the therapist role-played being a patient with her for practice. That therapist was also willing to help her whenever she needed it.

Even if Carlson could prove that her request for a tutor was related to her disability, and even if Carroll failed to take steps to make sure she was able to practice with someone, Carlson would still not have been required to provide Carlson with a tutor. Carlson requested a tutor that "worked with the school . . . to say this is how he tests, this is what we test, this is what we look for . . . ." (DPFOF ¶ 69, Carlson Dep. 177.) Carlson likens her request for a tutor to that of a request for an interpreter. Although § 104.44(d)(2) does not address whether a tutor falls in the category of an "auxiliary aid," it is significant that, while readers are deemed reasonable, "readers for personal use or study" and "individually prescribed devices" fall into the category of "devices . . . of a personal nature" that need not be provided. § 104.44(d)(2). Similarly, a tutor for personal use or study is more akin to a service of a personal nature. Accordingly, Carroll was not required to provide her with a tutor, much less a

tutor who was a adjunct instructor involved in the grading component of a class in which she was enrolled. Carroll's denial of her request for a tutor does not equate to a failure to reasonably accommodate Carlson's disability.

Carlson's request that Carroll should have provided or assigned to her a practice partner for practicing hands-on skills fails for the same reasons as her request for a tutor fails. She has not shown that her request was related to her known disability. Moreover, such request is no different than a tutoring service, which service, as already stated, Carroll was not obligated to provide as a reasonable accommodation to Carlson's ADD.

Next, Carlson claims to have requested that she be allowed do-overs. However, this request resembles the request of the student in *Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432 (6th Cir. 1998). Lisa Kaltenberger claimed that the school denied her reasonable accommodation for her ADD because she was not allowed to retake an exam after failing a particular class. *Id.* at 437. Relying on *Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985), the Sixth Circuit held that the "decision of the College not to waive this requirement and lower the standards for continued training in podiatric medicine is entitled to deference." *Id.* at 436-37. In *Ewing*, the court stated that when reviewing the substance of academic decisions, courts "should show great respect for the faculty's professional judgment." 474 U.S. at 225. Moreover, "[u]niversity faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Id.* at 225 n.11 (quoting *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96 n.6 (1978) (Powell, J., concurring)). So too is Carroll's decision not to permit Carlson any do-overs entitled to deference. *See also Hoppe v. College of Notre Dame of Md.*, 2011 U.S. Dist. LEXIS 78048, at *20 (D. Md. July 19, 2011) (stating that "no reasonable jury could find that a third chance [to take three exams] would not fundamentally alter the . . . Program

. . . ."). I find that Carroll did not fail to reasonably accommodate Carlson's ADD by refusing to allow Carlson any do-overs.

With respect to Carlson's next claim—that Carroll failed to reasonably accommodate her by not allowing her to reschedule exams and quizzes—Scherz-Busch opined in her testimony that people suffering from ADHD generally have time management issues and that is why they need to be able to negotiate deadlines for projects, papers, etc. (Scherz-Busch Dep. 257-58.) The record does not clearly indicate how many times Carlson asked her instructors if she could postpone exams. However, in one instance, Carlson emailed a faculty member asking to postpone an exam because "it's difficult studying this stuff without a study partner, at least for me anyway." (DPFOF ¶ 92.) Carlson's reason, albeit on only one occasion, indicates that she needed to reschedule an exam because she could not find a practice partner, not because she did not allocate enough time to study for the exam.[8] In an effort to spare repetition, for the reasons stated above, there is insufficient evidence demonstrating that Carlson's difficulty finding a practice partner was related to her disability. Although the reasons for her asking faculty members to postpone exams and quizzes on other occasions is unknown, it was Carlson's burden to come forward with evidence demonstrating that Carroll failed to reasonably accommodate her known disabilities, and she did not do that with respect to her request to reschedule exams and quizzes.[9]

---

[8] In October 2004, Carlson emailed Erickson requesting another try on the mid-term "due to the fact that [she had] no partner." (DPFOF ¶ 87.) This harkens back to the overarching theme of Carlson's claim, which is that she was unable to secure practice partners.

[9] Moreover, there is a difference in what Carlson claimed Carroll should have done, *i.e.*, that it should have allowed her to reschedule exams and quizzes, and what Scherz-Busch claimed people with ADHD need, *i.e.*, the ability to negotiate deadlines for projects, papers, etc. Asking to reschedule an exam on the day of the exam is not the equivalent of approaching faculty with more advance notice and asking for a different date on which to complete the examination.

23

Now on to Carlson's fifth requested accommodation: Carlson's request that Carroll assist her in developing time management, organizational, communication, and study skills. Carlson cited no record evidence showing that she made this request to anyone. It is a student's responsibility to request an accommodation. *See Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1077 (8th Cir. 2006) (student "bears the initial burden of demonstrating that he requested reasonable accommodations"). Because there is no evidence that Carlson requested such accommodation, no reasonable jury could find that Carroll failed to reasonably accommodate her by failing to assist her in developing time management, organizational, communication, and study skills.

Notably, however, even though Carlson provided no documentation indicating that she had issues with time management, organization, studying, or communicating, Carroll provided many of these services that Carlson claims to have been denied. Broman advised Carlson regarding how to adapt her learning style to compensate for her disabilities and counseled her on how to coordinate with faculty members to achieve her learning goals. (PPFOF ¶ 40.) In 2004, Deprey coached her with taking steps to avoid becoming overwhelmed. (DPFOF ¶ 129.) In March 2005, Broman and Carlson engaged in an academic coaching session whereby Broman provided Carlson with test-taking and study strategies. (DPFOF ¶ 130.) Also in March 2005, Broman gave Carlson advice on studying practices and the need to study differently for different kinds of exams. (DPFOF ¶ 131.) It remains undisputed that Carlson spent a lot of time meeting with all of her instructors. Because Carroll provided all-encompassing academic coaching sessions, Carlson's claim that she was denied such services is simply not accurate.

Finally, Carlson's claim that Carroll failed to reasonably accommodate her by not taking reasonable measures to address her classmates' resentment also fails. First, as discussed below, there is no evidence in the record that Carlson's classmates resented her for the accommodations that

Carroll provided to her. The evidence merely demonstrates that Carlson had difficulty finding a classmate to practice with and that she was sometimes confronted by classmates because of an issue related to her behavior with other students (at least as claimed by such other students).

Additionally, when Carroll's faculty members were approached with requests to intervene in the situation between Carlson and her peers, the evidence demonstrates that they took steps when necessary. For instance, when Carlson was confronted by Dama and missed her presentation, Deprey allowed her to give her presentation on a different date, one-on-one, and Carlson was not penalized for missing her originally scheduled presentation. When Carlson was given a lower grade by her peers in a class taught by Maher, Maher thereafter facilitated a discussion with her and her group members, which resulted in a higher peer grade. When Deprey received complaints from Carlson's peers because they felt Carlson was monopolizing faculty time, Deprey discussed with Carlson how she could seek to change negative perceptions that her classmates had about her. Deprey also asked Carlson's peers to "extend the olive [branch] to Cheryle." (DPFOF ¶ 95.) When the 2007 class president emailed Erickson and requested faculty intervention with the class' conflict with Carlson, the PT Program faculty discussed the matter and took steps to facilitate a class meeting between Carlson and her classmates (even though such meeting never occurred). Thus, Carroll took steps to address the tension between Carlson and her classmates.

Finally, Carlson claims that she sufficiently apprised Carroll of her needs for accommodation by making known to her instructors, her advisor, and the disability coordinator the ways in which she struggled academically. In making such argument, Carlson contends that Carroll did not, in good faith, engage in the interactive process. However, Carlson stands on no more availing ground in claiming that Carroll was bound by an interactive process, whereby it had an obligation to work with Carlson to determine what accommodations Carlson needed to successfully complete the PT Program.

Within the ADA context, "[o]nce an employer knows of an employee's disability and the employee has requested reasonable accommodations, the ADA and its implementing regulations require that the parties engage in an interactive process to determine what precise accommodations are necessary." *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996). Carroll contends that the interactive process is not applicable to Rehabilitation Act claims. Whether the interactive process is applicable to Rehabilitation Act claims, however, need not be resolved in this case. Even if such an interactive process is required in an academic setting, *see Guckenberger v. Boston University*, 974 F. Supp. 106, 140-42 (D. Mass. 1997), Carlson must demonstrate that she was "otherwise qualified" to complete the PT Program. Again, to show that she was "otherwise qualified," Carlson must establish that she could meet the requirements of Carroll's PT Program with reasonable accommodations. Because the accommodations she claims to have requested and denied do not constitute "reasonable accommodations," and because Carroll reasonably accommodated Carlson's disability by giving her extra time to take exams and quizzes in a private room, no reasonable jury could find that any additional reasonable accommodations would render her qualified to complete the PT Program.[10]

For the foregoing reasons, Carroll's motion for summary judgment with respect to Carlson's failure to accommodate claim will be granted.

---

[10] Relatedly, Carlson's first response to her dismissal from the PT Program indicates that she attributed her dismissal from the program and, more particularly, her low grade in the musculoskeletal class, on personal challenges unrelated to her disability. She stated that she lived in an unsafe environment that was not conducive to studying and that, when she found a better place to live, the landlord changed the locks, thereby rendering her unable to gain access to the premises to get her study materials. Such response strongly suggests that her dismissal from the PT Program was related to other factors outside of Carroll's control, other factors that quite possibly bear—in Carroll's favor no less—on the question of whether Carlson was "otherwise qualified" to complete the PT Program. The fact that Carlson kept her grades up every other semester, except the semester in which she lived in an uninhabitable home, also corroborates the notion that her studies were negatively impacted by a situation outside of Carroll's control.

In the end, this court is not insensitive to Carlson's situation. However, the court cannot stave off granting summary judgment on Carlson's failure to accommodate claim based on empathy. Armed with limited information from Carlson about her disability, about the limitations her disability caused, and about how best her disability could be accommodated, Carroll did what it could to ensure that Carlson completed the PT Program. Undisputably, Carroll provided Carlson extra time to complete exams and quizzes, and it granted her request to take exams and quizzes in a separate room. Carlson worked extensively with her faculty advisers one-on-one. Carroll's faculty members made themselves available to meet with Carlson at her convenience; they met with her to go over class material; they rescheduled a presentation without penalizing her; they conducted mediation regarding peer grades; they coached Carlson on how she could change the perceptions of her peers; they coached her in time management and study skills; and they spoke to her peers on her behalf. In light of her new diagnoses, Carlson cannot now, with the advantage of hindsight, claim that Carroll failed to reasonably accommodate her disabilities. Accordingly, summary judgment will be granted in favor of Carroll on Carlson's failure to accommodate claim.

## B. Peer Harassment Claim

Carlson also claims that Carroll did not prevent discrimination against her by her classmates due to her disability and accommodations. To establish a prima facie case for peer-to-peer disability discrimination under § 504 of the Rehabilitation Act, Carlson must demonstrate the following five elements: (1) she is an individual with a disability; (2) she was harassed based on that disability; (3) the harassment was sufficiently severe or pervasive that it altered the condition of her education and created an abusive educational environment; (4) the defendant knew about the harassment; and (5) the defendant was deliberately indifferent to the harassment. *Werth v. Bd. Of Dirs.*, 472 F. Supp. 2d 1113, 1127 (E.D. Wis. 2007).

With respect to the second element[11]—harassment based on disability—Carlson's evidence shows (1) that her classmates did not agree to practice/partner with her throughout the entire period of time she was enrolled in the PT Program; (2) that in 2004 one of her classmates told Carlson that the way she asked for assistance was off-putting; (3) that her classmates (who remain unnamed) complained to Deprey that Carlson monopolized faculty time; (4) that in May 2006 a classmate, Jessica Wege ("Wege"), emailed Carlson and criticized her for scolding a number of classmates for things that were Carlson's responsibility, and Wege also told Carlson that her attitude made students not want to work with her; (5) that, in the fall 2006, Carlson's classmates gave her a group participation grade of "72" for her work in a group project; (6) that, in December 2006, Dama accused her of being "mean" to Scharl, and calling Scharl "unchristian"; and (7) that the 2007 class president, on behalf of the 2007 class, complained to faculty about Carlson's "unprofessional, extremely rude, downright mean manor [sic]," and "unacceptable" behavior and asked faculty to meet with Carlson or mediate and referee a class discussion with Carlson. In support of her argument that her peers harassed her based upon her disability, Carlson also points to Erickson's handwritten notes of his meeting with the class president on December 15, 2006, which state that one of the three items they discussed included "policy to notify about taking tests elsewhere" and "student dismissal." Carlson also offers her belief that she was discriminated against because of her disabilities.[12]

---

[11]  The court assumes, once again, that Carlson is an individual with a disability, thereby satisfying the first element of her case of peer-to-peer disability discrimination under § 504 of the Rehabilitation Act.

[12]  Carlson claims that a student (who remains nameless) in her Ortho class, claiming to speak on behalf of the class, told Carlson that her classmates resented the fact that she received "special treatment" from Carroll and thought it was "unfair." (PPFOF ¶ 77.) However, this evidence is hearsay and, therefore, will not be considered in the resolution of Carroll's motion. *See* Fed. R. Evid. 801, 802.

Case 2:09-cv-00551-WEC   Filed 11/28/11   Page 28 of 31   Document 70

What Carlson has not demonstrated is any link between the conduct and behavior of her peers (even assuming this conduct constitutes harassment) and their knowledge of her disability or resentment of her accommodations. Importantly, there is no evidence demonstrating that Carlson's peers even knew about her disability. Carlson never told her peers about her disability. Carlson's mere belief that her peers "had to have known that [she] was receiving accommodations for some hidden disability because they could not help but notice that [she] was never in the classroom for tests and quizzes," (Carlson Decl. ¶ 6), is conclusory and therefore insufficient proof of her peers' knowledge of her disability. *See Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (affirming district court's decision to disregard conclusory portions of affidavits). The non-movant must rely on more than unsupported factual assertions to defeat summary judgment. *See id.* ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

Along the same lines, Carlson's statement that she "often heard [her] classmates refer to people with ADD in a pejorative fashion," and that her "classmates spoke about [their] classmate Joe Tepp's disabilities in a negative and demeaning fashion in [her] presence," (Carlson Decl. ¶ 6), is not enough to show that her classmates harassed her because of her disability. Carlson fails to identify which of her classmates referred to people with ADD in "pejorative fashion" and what was actually communicated to her. Moreover, she cannot defeat summary judgment by making general allegations against her classmates for the way that they allegedly treated someone else. Carlson's classmates' treatment of another student is unrelated to their treatment of her, and it does not prove that her classmates harassed her because of her disability.

The closest Carlson comes to demonstrating that she was singled out by her peers because of her disability is Erickson's December 15, 2006 notes from his meeting with the class president, in which he states that one of the three items they discussed included "policy to notify about taking tests elsewhere." First, this note does not establish that her peers knew Carlson was taking tests elsewhere because of her disability. This note also falls short of establishing resentment on the part of Carlson's classmates, much less their motive for refusing to practice with her, accusing her of being "mean," and turning to faculty for help as a last resort.

To be sure, the evidence suggests that Carlson experienced difficulties working with and getting along with her peers. However, as previously discussed, Carlson fails to present competent evidence demonstrating that her behavior and conduct towards her classmates about which they complained was attributable to her ADD. Even if Carlson presented such evidence, there still is no evidence that Carlson's classmates perceived her behavior as being a consequence of her disability.

In support of her peer harassment claim, Carlson offers only conclusory allegations that her classmates singled her out because of her disability and resented her for the accommodations she received while enrolled in the PT Program. Such conclusory allegations are insufficient to create a triable issue of fact. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002). Carlson has reported that her peers would not practice with her beginning in 2004. In 2004, she had not yet been diagnosed with ADD. Her classmates could not have harassed her because of a disability she had not yet known, much less requested accommodations for. Simply stated, Carlson presents insufficient proof that she was "harassed" because of her disability.

Because no reasonable jury could find for Carlson on the second element of her § 504 peer-to-peer harassment claim, it is unnecessary to determine whether a reasonable jury could find in her favor on the remaining elements of her claim. Carlson dedicates little, to no, argument supporting her peer

harassment claim, thus making further discussion and analysis of such claim unnecessary. Therefore, summary judgment must be granted in Carroll's favor on Carlson's § 504 peer-to-peer harassment claim.

NOW THEREFORE IT IS ORDERED that the defendant's motion for summary judgment be and hereby is **GRANTED**;

IT IS FURTHER ORDERED that the defendant's motion to strike the expert report and testimony be and hereby is **GRANTED IN PART AND DENIED IN PART AS MOOT**;

IT IS FURTHER ORDERED that this action be and hereby is dismissed;

IT IS FURTHER ORDERED that the Clerk of Court enter judgment accordingly.

SO ORDERED this 28th day of November 2011 at Milwaukee, Wisconsin.

BY THE COURT:

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge